1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THOMAS ALLEN GORDON,

              Plaintiff,

       v.

JOE BARNETT, *et al.*,

              Defendants.

Case No.  C03-5524KLS

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

      This matter has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4.  This matter comes before the Court on defendant filing of a motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. (Dkt. 162).  Having reviewed defendants' motion, plaintiff's response to that motion, defendants' reply thereto, and the remaining record, the Court hereby finds and orders as follows.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

      On November 21, 2007, defendants filed a combined motion to dismiss pursuant to Fed. R. Civ. P. 12(b) and motion for summary judgment. (Dkt. #162)  On February 21, 2008, pursuant to the stipulation of the parties, the undersigned granted defendants' motion to dismiss, which argued plaintiff had failed to exhaust all but one of his claims against defendants. (Dkt. #177)  At the same time, the undersigned also

1    granted plaintiff's motion for an extension of time to respond to defendants' summary judgment motion,

2    which solely concerned the one remaining claim. Id.  Specifically, plaintiff claims that while he was at the

3    Clark County Jail, he was placed on a restricted diet consisting of a food mixture termed "Nutraloaf" in

4    violation of his Eighth Amendment right against cruel and unusual punishment. (Dkt. #140).  He alleges

5    placement on the Nutraloaf diet caused him to suffer physical harm, including constipation and loss of

6    body weight.  Plaintiff has filed a response to defendants' motion (Dkt. #178), and defendants have filed a

7    reply thereto (Dkt. #183).  Accordingly, this matter is now ripe for consideration.

8                                              DISCUSSION

9            Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is

10   no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

11   law.  Fed. R. Civ. P. 56(c).  In deciding whether summary judgment should be granted, the Court must

12   view the record in the light most favorable to the nonmoving party and indulge all inferences favorable to

13   that party. Fed. R. Civ. P. 56(c) and (e).  When a summary judgment motion is supported as provided in

14   Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his or her

15   pleading, but his or her response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set

16   forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  If the nonmoving

17   party does not so respond, summary judgment, if appropriate, shall be rendered against that party. Id

18           The moving party must demonstrate the absence of a genuine issue of fact for trial.  Anderson v.

19   Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  Mere disagreement or the bald assertion that a genuine

20   issue of material fact exists does not preclude summary judgment.  California Architectural Building

21   Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).  A "material" fact is one

22   which is "relevant to an element of a claim or defense and whose existence might affect the outcome of

23   the suit," and the materiality of which is "determined by the substantive law governing the claim." T.W.

24   Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

25           Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of

26   summary judgment." Id.  Rather, the nonmoving party "must produce at least some 'significant probative

27   evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California

28   Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any

disagreement about a material issue of fact precludes the use of summary judgment.").  In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

As noted above, plaintiff is alleging that his Eighth Amendment right against cruel and unusual punishment was violated.  At the time of the events in question, however, plaintiff was a pretrial detainee at the Clark County Jail, although he later also was held at the same facility pending sentencing following his conviction for first degree murder. (Dkt. #164, p. 9).  This distinction is important because "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983) (citation omitted).  That is, the state "does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Id.

Since plaintiff was a pretrial detainee against whom there was "no formal adjudication of guilt" at the relevant time in question, the Eighth Amendment therefore "has no application" to his claim here. Id. Nevertheless, under the Due Process Clause the rights of persons who have not been convicted of a crime "are at least as great as the Eighth Amendment protections available to a convicted prisoner." Id.  Thus, while "[c]laims by pretrial detainees are analyzed under the Fourteenth Amendment," instead of the Eighth Amendment, "[b]ecause pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, . . . the same standards" are applied. Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

As noted above, the record before the Court shows that during the relevant time period plaintiff was incarcerated at the Clark County Jail on charges of first degree murder and unlawful possession of a firearm. (Dkt. #164, p. 9).  Specifically, for a period of approximately five and a half months from early August 2001, through mid-January 2002, plaintiff instigated or was involved in a variety of disruptive incidents resulting in numerous infractions. (Id. at pp. 9-13).  These incidents included: refusing to stop yelling and banging in his cell, pounding in his cell requiring staff to remove him therefrom, destruction of property, flooding his cell, starting a fire, throwing feces, refusing to cooperate with staff requiring use

of force, improperly activating a fire monitor on more than one occasion, urinating in the jail's dayroom multiple times, making repeated threats against jail staff, defecating on his food tray and passing it to jail staff, breaking a telephone off of a jail wall, repeatedly clogging a toilet, and breaking a sprinkler head off of a fire suppression system. Id.  In addition, plaintiff was housed either in administrative segregation or in separate holding cells for close observation for the majority of this time. (Dkt. #164-11).

A variety of disciplinary actions were taken against plaintiff in response to the above incidents and resulting infractions, including placing him on a 15-day restrictive Nutraloaf diet on two occasions. (Dkt. #164-11).  The Clark County Sheriff's Office, the agency responsible for administering the Clark County Jail, has promulgated the Sheriff's General Orders, which contain rules governing inmates' conduct and discipline. (See Dkt. #164).  Those rules provide that "[s]ubstitution of Nutraloaf* for some or all regular meals" may be imposed "due to disciplinary sanctions" for a period of "up to 30 days." (Dkt. #164-5, p. 4-5; Dkt. #164-6, p. 4-5; Dkt. #164-8, p. 11; Dkt. #164-9, p. 12).  They further provide that:

> *Nutraloaf should generally be used when the infraction involves meal service interruptions, the taking of extra food, hoarding of food or throwing food, but may also be used when other infractions fail or when approved by a supervisor on a short time basis.  A short time basis is defined as 48 hours or less.  If an inmate is placed on a nutraloaf ration in excess of forty-eight hours, it requires the approval of a commander.  Whenever an inmate is placed on a nutraloaf ration, the medical authority shall be contacted for monitoring and consultation.

(Dkt. #164-5, p. 4).

In addition, the Sheriff's Office's rules governing the delivery of food services sets forth a policy regarding "Restricted Diets Based on Safety and Security," which states:

> In the event that an inmate is riotous, disorderly or as a discipline sanction a special diet may be given to that inmate until the threat subsides.  The duty supervisor must approve these special diets with notification to the medical unit for tracking and documentation purposes.  This diet may consist of a nutritionally complete food loaf or other suitable substitute meal.

(Dkt. #163, p. 2).  The Food Services Manager for the Sheriff's Office states that based upon his "training, knowledge and experience" – including a Masters of Science degree in food science and clinical dietetics and 25 years of experience in food service management and teaching – "Nutraloaf diets are nutritionally sound," and "[n]utritional studies have shown that Nutraloaf meets nutritional needs of adults in terms of calories, protein, carbohydrates and fat." (Id. pp. 1-2, and Exhibits 1 and 2 attached thereto; Dkt. #163-2).  He further states as follows:

. . . As served in the Clark County Jail, Nutraloaf delivers an average of 2, 000 calories per day, thereby meeting macronutrient requirements.  In addition, Clark County Nutraloaf diets are supplemented by a vitamin and mineral supplement, "Nutricare," plus extra milk to provide 100% of the recommended daily allowance of micronutrients.

. . . I oversaw the restricted, Nutraloaf diet of Thomas Allen Gorden in 2001 and 2002.  My records reflect that his diet was consistent with the recipe and nutritional benchmarks described above.

(Id. at pp. 2-3).

Plaintiff states in his complaint that in late October 2001, he was placed on the restricted Nutraloaf diet, which he alleges he "refused to eat," because it "smelled foul and tasted so disgusting that he starved for several days." (Dkt. #140, p. 8, ¶24).  He further alleges that he began to "lose a lot of weight" and had "forced himself to eat" it. (Id. at ¶25).  In addition, plaintiff claims that he "started noticing that he could not poop," and that he was not able to "digest the segregated diet" for six days. (Id. at ¶26).  All requests for medical attention, plaintiff states, "were ignored." (Id.).

Sometime thereafter, according to plaintiff, he was transferred to Western State Hospital.[1] (Id. at ¶27).  Upon his return to Clark County Jail, plaintiff claims that he was put back on the Nutraloaf diet, and that he started "to become delerious [sic] due to starvation and thirst." (Id. at p. 9, ¶¶28-29).  He believed that the jail staff "were trying to kill him," claiming further that "[t]hey knew he could not eat or digest the segregated diet they kept" him on. (Id. at ¶29).  Later, after having been provided with "a normal jail meal served on a paper plate," plaintiff alleges he once more was placed on the Nutraloaf diet, again believing "that this was the officers [sic] way of messing with him." (Id. at p. 13, ¶51).  In addition, plaintiff makes the following allegations with respect to that incident:

The plaintiff was so starved that he forced himself to eat the "nutraloaf."  The plaintiff could no longer stomach the loaf after two days, but, only to plaintiff's findings, he could no longer poop.  He complained to the Sergeants and even declared a medical emergency in written request, all of which said, "I don't care."  Plaintiff remained constipated.  The plaintiff also heard some of the officers joking about the nutraloaf being "opposum[sic]-steak."  Plaintiff no longer touched the "loaf".

(Id.).  Two more relevant allegations plaintiff makes in his complaint are as follows:

. . . For the last 14 days in the cell in booking, plaintiff refused the segregated diet every meal, because it caused him medical problems.  Plaintiff . . . attempted to poop, or just tried to sleep the day away ignoring the pain in his stomach. . . .

---

[1]This apparently occurred on December 3, 2001. (Dkt. #164, p. 13).  Plaintiff remained at Western State Hospital until December 18, 2001. (Id.).

ORDER
Page - 5

1
2

> . . . The nurse finally came and seen [sic] plaintiff in regards to plaintiff's severe case of starvation, weighing him at 170.  Plaintiff was at average 190 pounds before he came to Clark County Jail.  Plaintiff was charged $3.00 for the "checkup," and nothing was done further medical wise. . . .

3

(Id. at p. 14, ¶55, p. 15, ¶60).

4
5
6
7
8
9
10
11
12

Evidence of plaintiff's medical treatment while at the Clark County Jail during the relevant time period indicate that he was seen by medical staff on a number of occasions regarding issues unrelated to his restricted diet. (See Dkt. #164, p. 13; Dkt. #164-12).  On August 21, 2001, two weeks after plaintiff was booked into the Clark County Jail, his weight was reported as being 176 pounds. (Dkt. #164-12, p. 25).  On January 11, 2002, plaintiff filled out a health care request form, in which he stated that he had "refused the Nutraloaf" for "14 days straight," because it "would ruin" his "digestive tract," stating further that he used to weigh about 196 pounds, while currently he believed he was not even 170 pounds. (Id. at p. 31).  In addition, he stated that he felt "really fatigue[d]." (Id.).

13
14
15
16
17
18
19
20

A jail health care provider responded to plaintiff's request by stating that the Nutraloaf was "very nutritional," and that there were "no contraindications for eating it." (Id.).  Three days later, on January 14, 2002, plaintiff requested that he be weighed, stating again that he had lost "a large amount of weight in the last 3 weeks." (Id. at p. 30).  In response to this request, a jail health care provider stated that they would set him up for four "weekly weights" to determine any weight loss. (Id.).  A week later, plaintiff stated again on an inmate request form, dated January 22, 2002, that he was 196 pounds when he first came to the jail, but that he had "steadily [sic] lost weight" since then, and that his diet needed "to improve." (Id. at p. 27).  A note on that form written by the "responding officer," however, indicates that plaintiff refused the "weekly weights" for which he previously had been scheduled. (Id.).

21
22
23
24
25
26

Defendants argue that restricting plaintiff to the Nutraloaf diet did not deprive him of his Eighth Amendment rights.[2]  The undersigned agrees.  The Eighth Amendment prohibits those "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (citations omitted).  To state a claim under the Eighth Amendment, an inmate must

27
28

---

[2]Again, while it is petitioner's due process rights which are implicated here because of his pretrial detainee status at the time, the standards are the same as those for prisoners proceeding under the Eighth Amendment. See Stewart v. Block, 938 F.Supp. 582, 588 (C.D.Cal. 1996) ("[E]ven if plaintiff were a pre-trial detainee, warranting analysis under the Fourteenth Amendment, the same standard applies to a claim of improper diet.") (citing Redman v. County of San Diego, 942 F.2d 1435, 1441 (9th Cir. 1991)).

satisfy two requirements.  First, the deprivation being alleged "must be, objectively, 'sufficiently serious.'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) (citation omitted).  That is, the prison official's "act or omission must result in the denial of 'the minimum civilized measure of life's necessities.'" <u>Id.</u> For claims based on failure to prevent harm, the inmate also must show he or she was "incarcerated under conditions posing a substantial risk of serious harm." <u>Id.</u>

In addition to this "objective component," there is a subjective one. <u>Keenan v. Hall</u>, 83 F.3d 1083, 1089 (9th Cir. 1996).  The prison official thus also "must have a 'sufficiently culpable state of mind.'" <u>Farmer</u>, 511 U.S. at 834 (citation omitted); <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993) ("[A] claim that a prisoner's confinement violate[s] the Eighth Amendment requires an inquiry into the prison officials' state of mind.").  This state of mind "is one of 'deliberate indifference' to inmate health or safety." <u>Farmer</u>, 511 U.S. at 834.  In other words, liability under the Eighth Amendment "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" <u>Id.</u> at 835 (citation omitted).   A prison official, therefore, will not be liable:

> [U]nless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harms exists, and he must also draw the inference.

<u>Id.</u> at 837; <u>see also</u> <u>Wallis v. Baldwin</u>, 70 F.3d 1074, 1077 (9th Cir. 1995).  A prison "official's failure to alleviate a significant risk that he should have perceived but did not," therefore, cannot "be condemned as the infliction of punishment." <u>Id.</u> at 838.

More specifically with respect to this case, "[t]he Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." <u>LeMaire v. Maass</u>, 12 F.3d 1444, 1456 (9th Cir. 1993).  Thus, "[t]he fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation." <u>Id.</u> (citations omitted).  The plaintiff in <u>LeMaire</u> contended, as plaintiff does here, that "his placement in a 'controlled feeding status,' in which his diet" was "restricted to a substance called 'Nutraloaf,'" violated his Eighth Amendment rights. <u>Id.</u> at 1455.  While it is not entirely clear whether the "Nutraloaf" used in <u>LeMaire</u> is the same "Nutraloaf" at issue in this case, at the very least they do appear to be substantially similar in nature, as described by the Ninth Circuit:

Nutraloaf as used in this case is a temporary substitute for a regular prison diet. It is

1    made by blending a variety of foods from normal prison meals. Only fresh ingredients
2    are used, and they are mixed according to nutritionally balanced recipes. The resulting
     substance is then frozen and later baked into a solid loaf and fed to inmates. This loaf,
3    while not particularly appetizing, does exceed an inmate's minimal daily requirements
     for calories, protein, and vitamins.

4    Id.

5        Unlike the Clark County Sheriff's Office's rules regarding use of Nutraloaf to discipline inmates

6    for a variety of infractions, the prison policy in question in LeMaire stated that an inmate could be placed

7    on a Nutraloaf diet only for conduct related to throwing or misusing food or human waste, or when failing

8    to return trays or eating utensils. Id.  The regulations in LeMaire further required the diet to "be rescinded

9    when the inmate" demonstrated "a return to acceptable behavior for a period of 24 hours." Id.  Also

10   unlike the Sheriff's Office's rules,  those in question in LeMaire provided that "under no circumstances

11   should an inmate remain in" such restricted diet status "for more than seven days." Id.

12       In LeMaire, the plaintiff had been subject to various disciplinary actions, including being

13   restricted to the Nutraloaf diet, in response to his violent and threatening behavior toward other inmates

14   and prison staff. Id. at 1447-49.  The Ninth Circuit found use of Nutraloaf as a form of discipline in that

15   case did not violate the Eighth Amendment. Id. at 1456.  In so finding, the Court of Appeals specifically

16   noted that Nutraloaf provided "an excess of nutritional requirements." Id.  It also noted that the plaintiff

17   "gained some sixty pounds in confinement" while on the Nutraloaf diet, in contrast to that of the inmates

18   in Hutto v. Finney, 437 U.S. 678 (1978), where the Supreme Court observed that "serving inmates a

19   tasteless food concoction called 'grue', which provided only 1000 calories a day, might be

20   unconstitutional if served for long periods."[3] LeMaire, 12 F.3d at 1456 (citing 437 U.S. at 686-87).

21       The Ninth Circuit thus found that the plaintiff in LeMaire not only was "not being starved" on the

22   Nutraloaf diet, but was "being fed," and "being fed adequately." Id.  With respect to the use of Nutraloaf

23   as a disciplinary measure in LeMaire, the Court of Appeals went on to hold that:

24       Nutraloaf provides an adequate prison diet and under the relevant prison regulations its
         use is limited to food-related infractions and cannot be imposed for more than seven
25       days.  Serving an inmate Nutraloaf as authorized under prison regulations and for such
         short periods does not deprive an inmate of "basic human necessities" and thus its use
26       does not violate the Eighth Amendment.

27

28
         [3]As further observed by the Ninth Circuit, the Supreme Court went on to comment that "a diet of 'grue' *might be tolerable for a few days* and intolerably cruel for weeks or months." Id. (same) (emphasis added by Court of Appeals).

ORDER
Page - 8

Id. (because temporary Nutraloaf diet does not deny minimal civilized measure of life's necessities, its use falls short of threshold deprivation necessary to form basis of Eighth Amendment violation).  In addition, the Ninth Circuit noted that the plaintiff in LeMaire had failed to show prison officials "had a sufficiently culpable state of mind to meet the subjective test" as also required to state a claim:

> There is not a scintilla of evidence in this record to indicate that the officials imposing Nutraloaf were either deliberately indifferent to LeMaire's health or welfare, or that as a sanction they were imposing Nutraloaf "maliciously or sadistically for the very purpose of causing harm."

Id.

Although as noted above there are some differences between the facts in LeMaire and those in this case, the Court finds plaintiff has failed to state a valid Eighth Amendment or due process claim in regard to his placement on the restricted Nutraloaf diet.  First, as in LeMaire, the Nutraloaf plaintiff was served appears to be nutritionally adequate.  Plaintiff does claim that unlike the plaintiff in LeMaire, he actually lost a significant amount of weight.  But plaintiff has failed to come forth with any evidence, other than his own bare allegations, to support this claim.  Indeed, plaintiff's medical records fails to show any such weight loss.  For example, while plaintiff claims he weighed 196 pounds when he first arrived at the Clark County Jail, it appears he actually was some 20 pounds lighter around that time, and certainly prior to the month during which he claims he first was placed on the Nutraloaf diet.

Plaintiff's veracity on this particular issue is further called into question given that he was offered the opportunity to undergo weekly weight measurements at his request, but then refused to take part in them.  Nor do plaintiff's health records show any contraindications for consuming Nutraloaf or any health problems as the result of having to eat it, despite his apparent regular use of the jail's health care services.  In other words, plaintiff has failed to set forth any credible evidence in support of his health claims here.  See Stewart, 938 F.Supp. at 588 (finding prisoner's failure to allege any facts tending to show disciplinary diet received was not adequate to maintain health, such as evidence he lost significant weight or incurred health problems, resulted in lack of valid constitutional claim).

The Court also finds the fact that the Clark County Sheriff's Office's rules allow for an inmate to be placed on a restricted Nutraloaf diet for a period of up to 30 days not to be dispositive here.  It is true that, as noted above, the prison policy at issue in LeMaire limited application of the Nutraloaf diet to a period of no more than seven days.  The Ninth Circuit in that case, however, did not hold that any period

of time longer than that would be impermissible, nor did it define the term "temporary". Further, at most, the record shows plaintiff was placed on the Nutraloaf diet for up to only 15 days at a time. This is only eight days longer than that which the Court of Appeals found permissible in LeMaire. As observed by the Ninth Circuit, furthermore, the Supreme Court has found a diet that provides only 1,000 calories per day – half the number of calories provided by the Nutraloaf diet here – "might be unconstitutional if served for long periods," meaning over a period of "weeks or months." LeMaire, 12 F.3d at 1456 (quoting Hutto, 437 U.S. at 686-87) (emphasis added).

Plaintiff argues that several other courts have found improper the use of food to discipline inmates for their behavior. The cases to which plaintiff cites, however, are either not helpful to plaintiff or can be distinguished on their facts. In Rust v. Grammer, 858 F.2d 411 (8th Cir. 1988), the Eighth Circuit found that the imposition of a disciplinary diet consisting of two cold sandwiches and water served three times a day was a "constitutionally permissible response to the disruptive situation" of inmates throwing food and contaminating the prison's food supply with urine and fecal matter, because it was "imposed only for a short time," as opposed to it being their regular diet, "with no resultant long-term adverse effects." Id. at 414. As in Grammer, here, too, plaintiff was restricted to Nutraloaf solely as a disciplinary measure for only relatively short periods of time, with no resultant long-term adverse health consequences. Further, the Nutraloaf diet, unlike that in Grammer is nutritionally adequate.

In Domegan v. Fair, 859 F.2d 1059 (1st Cir. 1988), the First Circuit stated that it was expressing "no opinion" as to whether a "mandated menu of bread, cheese, and water was so nutritionally deficient as to transgress either the Constitution or applicable statutes and regulations," noting merely that the plaintiff had alleged such a deficiency sufficiently enough to create a genuine issue of fact. Id. at 1064, n.5. In Thomas v. Jabe, 760 F.Supp. 120 (E.D.Mich. 1991), the district court rejected the plaintiff's claim that his Eighth Amendment rights were violated by having been given inedible "still-frozen" food which allegedly made him sick, because nothing in the record suggested defendant intended for plaintiff to be served such food. Id. at 123. Again, in this case, plaintiff, unlike the plaintiff in Domegan, was put on a nutritionally adequate diet. In addition, as in Thomas, plaintiff, as explained in further detail below, has failed to show that any of the named defendants acted with deliberate indifference to his health or safety, or intended that harm come to him as the result of his placement on the Nutraloaf diet.

1    Lastly with respect to the objective prong of the Eighth Amendment test, again the Court does not

2    find dispositive the fact that unlike in <u>LeMaire</u>, the Sheriff's Office's rules allow the Nutraloaf diet to be

3    imposed as a disciplinary measure for infractions unrelated to use of food or utensils.  Although the Ninth

4    Circuit did note this as a factor in upholding the reasonableness of the prison policy at issue in <u>LeMaire</u>, it

5    did not indicate that such a restriction was required in order to meet the objective prong.  Indeed, at least

6    one other district court has upheld the use of a disciplinary diet for infractions that were not specifically

7    related to the use of food or utensils based on the Court of Appeals' holding in <u>LeMaire</u>. <u>See</u> <u>Stewart</u>, 938

8    F.Supp. at 588.  The Court thus finds plaintiff has failed to satisfy the objective prong.[4]

9    Even if plaintiff could be said to have satisfied that prong, he has utterly failed to establish that

10   any of the named defendants acted with a "sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834.

11   That is, he has not shown they acted with "deliberate indifference" to his health or safety. <u>Id.</u>  While

12   plaintiff does allege in his complaint that certain unnamed jail staff were trying to kill him, he presents no

13   actual evidence of this, let alone that any of the named defendants had such intent or knew or was aware

14   that he could not digest the Nutraloaf.  Similarly, plaintiff fails to support his claim that his requests for

15   medical attention were ignored.  Again, as discussed above, the record shows that while plaintiff made

16   regular use of the jail's medical services, only some of his requests concerned the Nutraloaf diet, and even

17   then there was a lack of any evidence of significant weight loss or other related health problems.  Finally,

18   plaintiff's own refusal to proceed with the offered weekly weight measurements strongly undercuts his

19   credibility on this issue.  Accordingly, the Court finds plaintiff has failed to state a valid claim here.

20                                    <u>CONCLUSION</u>

21   For all of the foregoing reasons, the Court finds that plaintiff has failed to establish a violation of

22   his Eighth Amendment or due process rights arising from his placement on the restricted Nutraloaf diet.

23   He has not alleged any facts sufficient to establish a constitutional violation.  Defendants have met their

24   burden of demonstrating that there are no genuine issues of material fact, and thus that they are entitled

---

26   [4]Plaintiff also attempts to distinguish <u>LeMaire</u> from this case by implying that unlike him, the plaintiff in that case was
     "a violent and dangerous person" with "no regard for other human beings." (Dkt. #180, p. 4).  It may be that plaintiff did not engage

27   in violent and disruptive behavior to the same extent as the plaintiff in <u>LeMaire</u>, though the Court makes no particular finding  on
     that issue here.  Regardless, the record in this case certainly does reveal an extensive history of plaintiff instigating or being involved

28   in destructive and disorderly behavior that required the employment of a variety of disciplinary measures by jail staff, including
     at times the use of force and placement on the restricted Nutraloaf diet.  At least in part because of this, as discussed elsewhere
     herein, placing plaintiff on the Nutraloaf diet was constitutionally permissible.

1   to judgment here as a matter of law.  Accordingly, defendants' motion for summary judgment (Dkt.

2   #162) hereby is GRANTED and plaintiff's second amended complaint (Dkt. #140), and therefore this

3   cause of action, hereby is DISMISSED.

4         DATED this 3rd day of April, 2008.

5

6

7

8   Karen L. Strombom
    United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 12